Good morning, judges. Andrew Smith from the law firm of Smith, Marcino, and Bowman on behalf of Eric Quick, deceased by and through his administrator at Prosecendum Angelika Lamont. For starters, I guess I won't be as lucky as to just be able to rely on my brief in this case. Starting with the decision of the district court, I think there are three issues that are paramount that must stand out in the opinions of all of the judges reviewing this matter, and that being the reasonableness of the actions of these state police making a decision initially to enter the woods and put themselves in what might be perceived as harm's way. Well, but that, you know, that is, police responded to that, saying that there were houses around there. Well, and you're going at the police decision to not set up a perimeter but to follow them into the woods. They're saying, look, this guy could have been armed. Well, we know there are houses in the area. We don't know what he had in mind. He wasn't very compliant, that's for sure. You're saying they should have let somebody run into a wooded area in the vicinity of homes who may be armed. The clerk is acting very irrationally and just hope that the people who live near the woods didn't have a bad day? Well, the first issue becomes the totality of the circumstances under which this is supposed to be reviewed and his actions as well as the police officers. In this specific case, you had an individual who approached a police car, a marked police car, and asked for directions. Which kind of says something about the mindset of the guy they're dealing with. He steals the car and he goes to the police and says, I need some directions. At which time the officer then just ran an automated search on the plate to find out that the car had been reported stolen. It wasn't contemporaneous with him searching the car that this car had just been stolen. It just had reported stolen a few days before out of a different town. Turns on his lights, the judge accepts that there was not a high speed chase. He did attempt to cross the median, his car became disabled. But what we have is at least three separate local officers who are involved in a police chase with this individual. The individual did not have any acts towards those officers, no aggression towards those officers. When he exited a disabled vehicle to run into the woods- That all three members of the panel know the facts of the case. And I also realize that in your brief, you've ordered your arguments in the alternative, beginning with this alleged unreasonableness in entering the woods. But do you really think that's your strongest argument, even though you've put it out front? Respectfully, Judge Smith, I don't. We just did it at- Isn't there a problem even of superseding cause here once the woods has been entered, even if wrongfully or unreasonably, so that isn't your strongest issue or your stronger issues the other two? I.e., they shouldn't have begun shooting or even if it was reasonable to begin shooting, it was unreasonable to shoot over what at least one witness has indicated was a period of 10 seconds. It is, Judge Smith, and the reason for that, the chronology in the brief in both argument and facts, is to paint the picture of this building of Legos of how this continued to escalate. When you have five or six local officers who don't go into the woods, because they don't perceive this to be some eminent threat, an emergent situation where they have to run in right away with guns drawn, but then you have three rookie state police officers who run up, roll on the scene, jump out of their cars with their guns and go running into the woods. Let me say something about what eventually happened, but I think what Judge Smith is getting at, I don't think you're going to get us to say that police don't have a general right to pursue a felon who's in flight. I can conceive of circumstances where I would say perhaps not. A 110-mile-an-hour chase down Market Street would probably not be good judgment, whatever the circumstances, but here, that doesn't seem to me to be a starting issue. The issue is we're there. Okay. Okay. We agree, at least I think we do, that there's a pretty clear constitutional right established against excessive use of force. So I think the issue here, when does the force become excessive? When does it become unjustified? Why doesn't qualified immunity, as the judge thought in the trial court? It did. The totality of the circumstances from even these three individual troopers who were in the woods with him, their encounters with him. The first time they encounter him, he's laying in a fetal position on the ground and they draw their weapon down on him. They yell at him, show me your hands, show me your hands. He gets up and he runs forward. He's in sweatpants and a t-shirt and no shoes in the woods in the pitch black. Five police officers armed with guns, flashlights. The pitch black hurts you, though. But he's, it does, I would disagree respectfully, Judge McKee, because my client had nothing to see. He had no flashlights. He had no visibility. While the troopers all had flashlights aimed on him, they testified that they could see the whites of his eyes. And testified to a furtive movement. They say that there's a furtive movement. They're yelling commands to him, show me your hands. He's got one hand in his pants. He pulls it out to show his hands. Three troopers shoot him 39 times. And of the shots, they only hit him 18. Of the 18 that hit him, 11 of them are in the back of his body, posteriorly. And the angles and trajectories of them is from down to up. Mr. Smith, I realize, necessarily, and by definition in the unreasonable disinquiry we have here, you must argue the facts. And so it's inevitable that the argument is going to sound something like a jury argument. But in recounting all those facts, it seems to me you're conflating the alternative theories here, too. I mean, what, in reciting the length of the firing and how many shots were fired and how many actually hit Mr. Third theory here, that at some point in time, it was unreasonable to continue firing. It is. Well, all of the officers agree, and the Attorney General guideline is it's called a two-tap method. Shoot twice and assess. There's continuous firing from these three officers the entire time. So that's the first issue. So they did not two-tap and assess. The other is there's five officers in the woods. One has 20 years of experience. One has seven years of experience. They don't fire a single shot. So at no time during the course of their interaction with Mr. Quick did they feel that they themselves perceived any action by him enough that they initiated or were the first people to shoot. It was the three rookie state police officers who initiated the firing. The other issue becomes that they're lines of sight. They're anywhere from six to eight feet apart. It can be up to 16 feet away. But every one of them testified that he was looking directly at them. That creates a genuine issue of fact. There's discrepancies in what each of them could have seen. There was also the medical testimony from the medical examiner that said the gunshot wounds to his right hand that they all alleged was in his pants, that he tried to pull out like a gun, had two bullet holes in it. Well, the medical examiner did testify, did he not, in his deposition that Quick's right hand was not in his waistband. It had to be clearly out. And there was nothing in his hand other than a two-inch crack pipe that was the size of a cigarette. What do we do if that, assuming that at trial, that opinion can't come in because the person who gave it, the medical examiner is not an expert in that area, not competent to testify, not competent to give an opinion of that nature. How do we handle that? Well, I believe, I would believe that he would be able to testify in his capacity. He was the medical examiner. He was seen to what he saw from bullet wounds in the trajectories, and that if his arm had been there, he would have had. Yes, trajectories. Why didn't you simply call a ballistician or offer a ballistician's opinion? But that's, if it goes back to trial, that's a decision that can be made later. I want to go back to what you said earlier. Why do you concede that two shots were proper? I've never heard of that. There was testimony from the officers. It's Officer Kirkby and Sergeant Swanson, both testified as the attorney general guidelines, which are a two-tap and assess, as well as our police expert. Don't we know from almost all police shootings that once the shooting starts, the magazine gets empty? But I don't understand. If that's the case, I don't know that that makes it right, though, Your Honor. Under the circumstances, the firing two shots was proper. Part of the problem in this case is the fact that our expert talked about. He was a New Jersey State police. He was a chief of police. He worked for 20 years for the U.S. Department of Justice and the DEA. He talked about policies and procedures and what should have occurred, that there are less intrusive means when you have five officers surrounding someone in sweatpants and a T-shirt with five flashlights in his eyes than to say, show me your hands and then shooting them 39 times. There are certainly less intrusive means than just going from show me your hands to initiating deadly force and shooting someone 39 times. There were no reports throughout the entire pendency of the chase and what proceeded of at all that he was armed or dangerous or he had a weapon of any kind. I think you're getting around to my question. So what you're really saying is that deadly force was not appropriate. That's correct. And to the extent that it was necessary, that they deemed it necessary when he pulled his hand out, it wasn't necessary to have continued firing from a range of six feet. I mean, you have five officers, three of them shooting 39 bullets from. But it just seems to me two shots, 39 shots, two shots can be just as fatal as. And obviously from the trajectories of the bullets and even the testimony of the officers, they say he spun, the medical examiner says the body doesn't spin. When a body is shot, the bullets pass through the body, the body does not spin like in TV. Judge Hillman completely discounted that and noted it in a footnote in his opinion that despite the fact that the medical examiner's opinions controverted the opinions of the officers who said his body spun, to explain why, I mean, you have a trajectory of a bullet in the back of your leg going up and out the front of your leg. He couldn't be standing upright because the officer would all have to be laying down on the ground on their back shooting up. But this is an argument you want to make to the jury. But there are also facts that were just completely ignored by Judge Hillman. You're asking for a trial, not. We're asking for a trial. There was clearly an error as a matter of law in that none of these facts were viewed in a light most favorable to Mr. Quick. To the converse, they were viewed in every light favorable to the State. And if you look at the opinion, the opinion itself, and I say this respectfully, was a comedy of errors. Every. You say that again. A comedy of errors. Respectfully, the judge's opinion was a comedy of errors. It's a comedy of errors. Every single. I read the opinion and I would not characterize it as that even if it's wrong. And don't be too respectful of our decision when you get it wrong. I understand. But every factor that weighed in favor of the plaintiff was placed in a footnote in his written opinion. That's obviously not the standard on summary judgment. All facts are to be viewed in the light most favorable to the plaintiff. Under excessive force, in excessive force cases, in fact, they're almost all supposed to be accepted as true. And in this case, none of them were. Neither the opinions of their expert, neither the opinions of a medical examiner, nor statements of officers that can controvert the statements of the State Police. None of that was taken as true in the plaintiff's case. As a result, we would respectfully submit that he did, in fact, commit an error of judgment when he found that one, the use of deadly force was reasonable and subsequent to the use of deadly force, that firing continuously 39 shots, 11 of which hit this individual in the back, was excessive. Mr. Smith, thank you. Thank you. Good morning, Your Honors. Good morning. John Connell from Archer and Greiner on behalf of the defense. The sole legal issue in this case is whether the conduct of the police officers in question in using deadly force was objectively reasonable under the totality of the circumstances. Once we've articulated that legal principle, we then jump off the diving board into the large and deep pool of facts in this case. The fact of the matter is, though, that the objective reasonableness of their conduct must be measured against issues such as the severity of the crime, which we here know, and the police knew at the time, was a felony. It was a theft of a vehicle. Not an inherently dangerous felony. Absolutely. But would you agree that it's the Garner principles that we should be looking at? Absolutely. Garner versus Tennessee. Absolutely. And you may have not heard the question correctly. You said absolutely. I'm not sure you were conceding that. But it's not an inherently dangerous felony. That was the question. Well, query whether that's so under these circumstances present in this case. There was testimony that he used the vehicle to ram another police car. He was first going north on Interstate 295, then crossed the median to go south. There's testimony that the speed was in excess of, I think it was 110 miles an hour, that he was swerving from the shoulder to the, I guess that would be the far left lane. Well, Mr. Smith maintains that this is not a situation where there's a finding of a high-speed chase. Do I misunderstand him to say that? I understand. The issue was, as I think Judge Smith pointed out, the use of deadly force occurred in the woods. But all of this, these were facts that colored the impression of the officers as they entered the woods and created in their minds an impression of the danger that they were facing. I don't know how that helps to get these guys out of the car now. I'm sorry? That was Mr. Smith's point. That's why he was, I guess, getting into the factual underpinnings here. He's out of the car. The high-speed chase is over. He's out of the car. You've clearly got someone who's acting very recklessly. But he's out of the car. He's in the woods. Exactly. Surrounded by a number of state troopers and local officers. Exactly. And you're saying, given that scenario, 39 shots, 11 which to the posterior. When you say back, it sounds like they all hit him in the back. But they hit him in the back, in the rear of his body. They weren't in his back. Yeah, I think the point here was the officers all said that he was in a bladed position. See, that's part of the problem. The officers all testified exactly. It's something like this. You want to hear my point? And so when he pulls his arm out and shoots. Can you hear the question, counsel? What do you want to hear? Mr. I'm sorry. Judge McKee was asking a question. Yeah, the problem was you said the officers all said the same thing. I said that may be part of the problem. I mean, there are testimony. It's almost like in a handwriting case where you get layover handwriting. It is absolutely, to the letter, identical. This blading posture that you are getting into. I know we're in summary judgment. But doesn't Mr. Smith have a point that the court did not look at the record from the point of view most favorable to the plaintiff here? That he seemed to accept everything that favored the defense without factoring into that equation. The record in the light most favorable to the plaintiff. Yeah. I understand the question. I don't think that was the case, respectfully. Clearly, and it's clear that in undisputed, your officer said, show me your hands. They all said that. And then the act of showing the officers his hands becomes the reason for exercising deadly force because him doing what he's asked to do at gunpoint becomes the fruitive gesture that justifies the deadly force. Does that make sense? I know exactly the point you're making, Judge, and it's a good point. But it wasn't a situation where the decedent in this case slowly stepped forward, showed his hands. They described it as ripping or pulling or drawing his hands out quickly from his waistband. Right after, don't forget this too, two of the officers testified that they heard the decedent say, don't make me do it, don't make me do it. I know. I mean, that was their testimony. For three officers in a very deep, thick wood in dark night with flashlights trained on this fellow and he's screaming at them in this position, this is at least a terrifying situation, having known what he did before he entered those woods. It doesn't. I'm sorry. Go ahead, Judge Stearns. I just want to go back to what bothers me about the decision of the court below, because we obviously can get immersed in the facts of the case. Isn't it true that Judge Hillman had qualified immunity conflated with the first inquiry on the qualified immunity analysis? I mean, first we asked whether a constitutional violation occurred. As I understand it, he says, no, I don't see one because I think the officer's conduct was objectively reasonable. Therefore, they're entitled to qualified immunity. Shouldn't he have stopped if that's what he really thought at the first inquiry? And if he is making a reasonableness finding, isn't that really a jury issue, not an issue of law for the court? No, because qualified immunity in the first instance is always a question of law for the court based upon the undisputed facts and the facts here are in fact undisputed. What is the law for the court? I think it's pretty well established that the excessive use of force, particularly a fatal use of force, is a Fourth Amendment violation in a seizure context. As I understand his opinion, he finds what the officers did was perfectly reasonable under the circumstances. Therefore, no constitutional violation occurred. Therefore, as I understand, Saussure v. Katz should have stopped there. But then again, he stops us on what seems to me to be a jury issue. I don't understand why that would be a jury issue. If the court, in fact, in addressing the qualified immunity issue is required to assess the objective reasonableness of the conduct of the officers based on the undisputed facts, that becomes a question of law which the court is entitled to make and did make, in fact, in this case. So reasonableness, at least in some instances, may be determined as a matter of law. Absolutely. But reasonableness sometimes, based upon the facts that are before us, may require us to determine that it's a jury question. That would turn upon, as I understand the case law, whether or not the plaintiff has been successful in proffering contravening proofs that would put at issue the objective reasonableness of the conduct of the officers. That's not the case here. What about the point raised by Judge McKee relative to the command, show your hands or words to that effect? In fact, just to perhaps confuse matters a bit, weren't there, by the testimony in the depositions, actually conflicting commands given? Wasn't there a show us your hands command and also a freeze command by someone? Doesn't that appear somewhere in the testimony? There could be an argument made that there were conflicting commands. The point was they were trying to wrest from the decedent his compliance in stopping the conduct that he was engaged in. But see, if you're saying there could be an argument made and we're accepting the point of view of the plaintiff, let's assume that there were conflicting commands and then you're saying he was shot because he wasn't complying with the commands. How do you comply with conflicting demands, commands? But keep in mind, Your Honor, here, the decedent was heard saying, don't make me do it. Again, that was the testimony. That's compelling testimony here, heard by two of the four officers. Well, and you have made the point, have you not, that irrespective of anything he said or may have said, that the consistent testimony of the officers is that what his responsive conduct was was anything but what the command was. That's correct. It was abrupt, referred to as the testimony of some witnesses' character. That is correct. And furthermore, I would add, every one of the officers, including the other two at the scene who did not shoot Swanson and Carson, I think it was, every one of them said, based upon his actions, they absolutely believed he had a weapon. Isn't that the only fact? It may be a powerful fact. It may be a determinative fact. But isn't that really the only fact here you or your clients have going for them in terms of demonstrating reasonableness under all these circumstances? I'm sorry, demonstrating? Demonstrating under all these circumstances of opening fire on Mr. Quiff. That is, the quick or abrupt response in removing his hand from his waistband. There's no question that those facts pose to those officers a serious risk of physical harm, in their minds at least. Was there any testimony inconsistent with or in conflict with the testimony that after hearing the commands, Mr. Quiff removed his hand quickly or furtively or however it was otherwise described? No. No. How do we, and maybe there's no answer to this, no satisfactory answer. In a situation like this where you've got seven or eight or nine witnesses on one side, police witnesses, the claim is based upon excessive force, i.e. deadly force. There's almost never, well, I'll take that back. In an urban setting, that's not the case.  Where there is no one to testify to contradict the police officers. The officers did not give statements right away. They waited two or three days after consultation with an attorney. They gave statements which are, as I said, layover statements, remarkably similar. If we're not able to look at things like the medical examiner's conclusion or some of the inherent unlikeliness of all of the testimony, how would a plaintiff's estate ever get past summary judgment in a case like this? The case law, and we cited this in our brief, is very clear. Notwithstanding necessarily the absence of the decedent in terms of his ability to testify, the plaintiff is required still to proffer contravening proofs. Now, in this case, the standard is the same under those circumstances in terms of review of a summary judgment motion, right? It is. But, and I think you cited our case of Abraham v. Rasso, which wherein a panel of this court did say we should be cautious where those are the circumstances. A lineup of witnesses, police officers present, and no one surviving on the other side who can refute them. Absolutely. And, Your Honor, to address your point, sure, the officers all had the same rendition of the story. You know, maybe that's just because that's exactly what they all saw. I mean, the fact of the matter is plaintiffs did have the opportunity to depose these officers at length, to question them at length, to grill them, to find and probe and discover what the weaknesses were in their case. We produced to the plaintiff and now to the court almost 1,400 pages of investigatory materials that document what was undertaken in the wake of the shooting to find out what actually did occur. And every aspect of that investigation corroborates the account on the part of the officers. Keep in mind, too, one of the five officers at the scene, Swanson, was a municipal officer. I think he was from the Belmar Police Department. So he's not in alliance necessarily with these other defendants who are all state police defendants. But let's go back. We agreed at the outset that Tennessee versus Garner governed. And under Garner, we have to go under the alternative prong, that is that the officers had to reasonably believe that there would be a significant threat of death or injury. Which they did. Themselves or someone else. If you interpreted the gesture, which plaintiffs would say from their perspective, was one of compliance with a gesture of threat to the officers, you would have to say that no reasonable jury on the facts as presented in the light most favorable to the plaintiff could do anything but conclude that no constitutional violation occurred. Well, I think the threshold question is actually would any reasonable officer conclude differently than these officers did? And the answer to that was unequivocally no. If you go to qualified immunity. Yes, absolutely. Absolutely. Well, and that's frankly, I mean, that's the issue before the court now. So other questions? No. Okay. Thank you, Judge. Thank you very much, Mr. Hill. Mr. Smith, I think you saved some time. Did you save some time? I did, but I did not request it. But if I have it, I would. Well, if you didn't request it, you don't have it. I had requested it, but I hadn't. Oh, say it again. He did? Okay, all right. Go ahead. If I could, and I will be brief. There's a couple of points, obviously, that the justices all brought up. And it is whether or not he was pulling his hand out in a manner that was consistent with some of the instructions of show me your hands. And that is a key question. There's two things that I'd like to note that I disagree with my esteemed counselor, who did argue. There were five officers in the woods, and they were in a semicircle. And Carson heard Mr. Quick not say, don't make me do it. His testimony was that he heard him say, don't, don't. Maybe, don't shoot me if I pull my hands out of my pants. The officer to his left, which I believe was Manzo, says absolutely positively I heard him. He said to me, don't make me do it. I swear I'll do it. But yet, Motorelli, who's looking directly at him, said he never said a word. Swanson, who's standing right behind Motorelli and right next to Carson, said he never said a word. Moyer, who's to the right of him, said he never said a word. Kirkbride, who's on the edge of the woods, said Quick never said a word. But let's assume for a moment. That's an issue of fact. Well, let's assume that he never said a word. Let us assume that the only thing upon which we can base our ultimate determination, the only fact that the district court could look at, was what Mr. Connell has indicated was not refuted, not contradicted, and that was this quick move, this sudden move, this furtive gesture, however it's characterized. Correct. But all of them testified that he was stuck in thick sticker bushes and couldn't move any farther. He might have been pulling his shirt. He might have just been stuck. How do the officers know that? You can't ask officers to take that chance. The officers all testified that he was stuck in a thick, rubbishy bush and he couldn't move any farther. He might have been. Does that mean that he was completely immobilized, that he could not move anything? That's why I'm asking you to look just to this one fact. We don't, and that's why I believe the opinions of Dr. Williams come into play, in that there are less intrusive means than deadly force. If this panel was to accept the decision of the district court, I would submit that every officer who's ever involved in deadly force can just say, yeah, the guy made a furtive move and he almost shot me. And there's no one will ever be able to beat that case from today to the day my children hopefully don't practice law. It'll never be able to be beaten because an officer will just simply say, he made a furtive movement, I thought he was pulling a gun. I mean, they had five flashlights shined on him. He had a closed fist with no weapon. And are we as a panel going to allow that? in his sweatpants to say, well, from now on, all you have to say as an officer is the guy had a closed fist or his hand was around his waistband and he moved it quickly. So, yep, deadly force is acceptable. And not only deadly force, but it wasn't one or two shots hit center mass because they were fearing for their safety. Thirty-nine shots. Twenty-one missed shots. And eleven that hit him in the back, which is more important. Thank you very much. Thank you. Thank both sides for your helpful argument.